UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION
_____

EDWARD JAMES CROMER,

                    Plaintiff,                          Case No. 2:22-cv-75

v.                                                      Hon. Hala Y. Jarbou

HEIDI E. WASHINGTON, et al.,

                    Defendants.

_____/

## OPINION

This is a civil rights action originally brought under 42 U.S.C. § 1983 by six state prisoners housed at the Marquette Branch Prison (MBP) in Marquette, Marquette County, Michigan. In an order (ECF No. 20) entered on April 1, 2022, the Court dismissed Plaintiff Charles Demario Johnson for failing to pay $67.00, his proportionate share of the filing fee. In another order (ECF No. 21) entered that same day, the Court severed the claims of the remaining five Plaintiffs into separate actions. Each Plaintiff, including Plaintiff Cromer, was ordered to file a second amended complaint containing only the allegations relevant to that Plaintiff. (*Id.*) Plaintiff has now filed his second amended complaint. (ECF No. 22.)

Under the Prison Litigation Reform Act, Pub. L. No. 104-134, 110 Stat. 1321 (1996) (PLRA), the Court is required to dismiss any prisoner action brought under federal law if the complaint is frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant immune from such relief. 28 U.S.C. § 1915A; 42 U.S.C. § 1997e(c). The Court must read Plaintiff's *pro se* complaint indulgently, *see Haines v. Kerner*, 404 U.S. 519, 520 (1972), and accept Plaintiff's allegations as true, unless they are clearly

irrational or wholly incredible. *Denton v. Hernandez*, 504 U.S. 25, 33 (1992). Applying these standards, the Court will dismiss Plaintiff's complaint for failure to state a claim against Defendants Kessler, Mohrman, and Minthorn. The Court will also dismiss, for failure to state a claim, Plaintiff's claim against Defendant Washington regarding the constitutionality of MDOC Policy Directive 01.04.130. The following claims remain in the case: (1) Plaintiff's Fourteenth Amendment equal protection and ADA challenges to the Start Unit; and (2) Plaintiff's First Amendment retaliation claim against Defendant Ricklefs.

<u>Discussion</u>

## I.    **Factual Allegations**

As noted above, Plaintiff is currently incarcerated with the Michigan Department of Corrections (MDOC) at MBP, where the events of which he complains occurred. Plaintiff sues MDOC director Heidi E. Washington, as well as the following MBP personnel: Warden Erica Huss, Assistant Deputy Warden Unknown Pelky, Resident Unit Manager Unknown Erickson, Hearing Officer Thomas Mohrman, Lieutenant Unknown Minthorn, and Officers Unknown Kessler and Unknown Ricklefs.

Plaintiff alleges that he has been diagnosed with several mental disorders, including experiencing delusions and hallucinations, depression, crying spells, and "substantial disorder of thoughts and moods." (ECF No. 22, PageID.194.) According to Plaintiff, Defendants Washington, Huss, Pelky, and Erickson conspired to have him placed in the Start Unit "as a form of weaponry." (*Id.*) Plaintiff claims that he was transferred five or six times in 13 months "as a result of [his] advocacy to uphold[] the U.S. Constitution." (*Id.*) Ultimately, he was declared mentally ill and placed in the Start Unit. (*Id.*) Plaintiff is prescribed a "plethora of medications," including Haldol, Benadryl, and Trazodone. (*Id.*) Plaintiff asserts that Defendant Huss had him placed on Haldol because he "continued to discuss with [her] while making rounds 'that she was suppose[d] to

summon the start police and report a crime was being committed because she ha[d] no record of

cause.'" (*Id.*, PageID.195.)

Plaintiff was placed in MBP's Start Unit approximately two years ago. (*Id.*, PageID.198.)

The Start Unit is an alternative to administrative segregation:

> The Department is in the process of piloting general population Start Units as an alternative placement for eligible prisoners who would otherwise be classified to Administrative Segregation. These units provide a structured environment where prisoners move through progressive levels as the prisoner demonstrates positive behavior and program participation with the goal of reintegrating them back into a traditional general population setting. . . .

> The targeted prisoner population groups for placement in a Start Unit are:

>> Prisoners who have been diagnosed with serious mental illness, as defined by Mental Health Services policy, procedure and protocol, whose disruptive behavior would warrant reclassification to administrative segregation.

>> Prisoners who refuse to return to a traditional general population setting that has resulted in extended administrative segregation placement.

>> Prisoners who have a history of repeated disruptive behavior, who would otherwise be classified to administrative segregation for new negative behavior.

>> Other prisoners who would benefit from placement in the Start Unit based on their disruptive behavior, as approved by the CFA Deputy Director or designee. This may include prisoners who are within one year of their discharge date or who have received positive parole action.

> Each prisoner accepted for placement in a Start Unit will be provided intake processing, during which time the prisoner's behavioral history and program needs will be reviewed to develop the prisoner's individualized Start Plan. The Start Plan shall clearly define behavioral benchmarks for increased privileges and programs for the prisoner while housed in a Start Unit.

> After intake processing, there are four stages through which prisoners may progress while in a Start Unit. Stage 0 is the most restrictive and Stage 3 is the least restrictive. A prisoner's progression within a Start Unit will be based on the individual prisoner's behavior at each stage and subject to recommendations made by the housing unit team and Security Classification Committee (SCC).

> Prisoners in a Start Unit may participate in all activities and services provided to prisoners in a traditional general population setting, subject to restrictions to

preserve the custody and security of the facility. This may include restrictions on group activities and activities that require the mass movement of prisoners. Activities that are traditionally provided to general population prisoners in a group setting, or that require mass movement, may instead be provided to these prisoners in the housing unit, the prisoner's cell, or in another specifically designated area of the institution. Activities also may be provided at specifically designated times or under escort, as needed. Personal property also may be restricted or used as an incentive for progression through Start Unit stages.

MDOC Director's Office Memorandum (DOM) 2021-17 (eff. Jan. 1, 2021).

Plaintiff asserts that his placement in the Start Unit is not justified because he is not disruptive. (ECF No. 22, PageID.196.) He "has never made an administrative admission to [a] 'mental unit.'" (*Id.*) Plaintiff claims that Defendants are "exaggerating mental health as a way to hide constitutional rights." (*Id.*) Plaintiff avers that the Start Unit is "operated as 'a secret prison.'" (*Id.*) He alleges that there is no graduation or ending period, which causes psychological stress. (*Id.*) According to Plaintiff, inmates in the Start Unit go "4-5 days straight every other week [with] no showers [and] no yard." (*Id.*, PageID.197.) He claims that on other weeks, prisoners with diseases such as scabies will be brought to the Start Unit to shower. (*Id.*) Plaintiff avers that during COVID-19 outbreaks, staff members in the Start Unit "at no time [wore] protective gear." (*Id.*)

Plaintiff states that he has been classified as the unit porter, but that he rarely does his porter duties because staff "are on the computer watching 'movies' and wish not to be disturbed." (*Id.*) He avers that he is not able to attend the law library or religious services, that he is forced to use a "dog cage" during yard, and that he is limited to two 15-minute calls per day. (*Id.*) The Security Classification Committee (SCC) does not operate in the Start Unit. (*Id.*) Inmates are "subjected to punishment for unwritten rules." (*Id.*, PageID.198.) Moreover, the Start Unit has no garbage cans or bags. (*Id.*) Defendant Kessler and Lieutenant Schroderus (not a party) also repeatedly deny yard, even though Plaintiff can clearly see that general population inmates are receiving yard privileges. (*Id.*) Plaintiff avers that he "has not seen or experienced anything close to the operation of [the]

4

Start Unit." (*Id.*) He claims that the Start Unit "is 'mentally dangerous' for anyone who participates." (*Id.*, PageID.198–199.)

Plaintiff goes on to allege that on April 8, 2021, he was having a "quiet conversation" with other prisoners. (*Id.*, PageID.199.) Plaintiff was telling the others that the fact that he is in prison is "illegally repugnant to the United States Constitution because [of] no record of show cause." (*Id.*) He claims that the Start Unit is "a very small unit so the prison staff monitor and listen to all conversations amongst the 22 [participants]." (*Id.*) Defendant Ricklefs began calling Plaintiff names and told him to "shut the f*** up." (*Id.*) Plaintiff continued to 'hold the discussion." He was subsequently taken to administrative segregation for threatening behavior. (*Id.*) Plaintiff avers that this was retaliation for his speech. (*Id.*, PageID.199–200.) On April 14, 2021, Plaintiff appeared for a hearing. (*Id.*, PageID.200.) Plaintiff requested that Defendant Huss appear as a witness. (*Id.*) According to Plaintiff, Defendant Huss would have vouched for the fact that Plaintiff was discussing his own records. (*Id.*) He claims that Defendant Mohrman denied his request. (*Id.*) Plaintiff was found guilty and sentenced to 21 days' loss of privilege (LOP) status. (*Id.*)

Plaintiff goes on to allege that January 10, 2022, was a "store day" at MBP. (*Id.*, PageID.205.) Plaintiff "was having psychotic depression and hearing voices episodes." (*Id.*) In order to protect himself, he placed his plastic bag from the store "neatly in front of his cell." (*Id.*) According to Plaintiff, the MBP Orientation Rule Book provides that all plastic bags must be turned in the "same day store is received." (*Id.*, PageID.206.) Plaintiff avers that plastic bags are contraband, and that it is a common practice for prisoners in the Start Unit to dispose of them "on the rock or gallery." (*Id.*)

On January 11, 2022, Defendant Kessler made rounds and shouted out that "you retards throw out all these plastic bags!" (*Id.*) Plaintiff responded, "I was hearing voices, and when the

bags [were] not collected I set mine[] out." (*Id.*) Defendant Kessler stated, "If they collected the plastic bags, you retards will only use a sheet!" (*Id.*) Defendant Kessler then issued a misconduct to Plaintiff and other prisoners, charging them with destruction or misuse of property. (*Id.*) Plaintiff contends that this misconduct caused him to decompensate and that he "went into a dark spot." (*Id.*)

Plaintiff appeared before Defendant Minthorn for a misconduct hearing on January 18, 2022. (*Id.*, PageID.206–207.) Plaintiff's "defense was #1) [Defendant] Huss as a witness since [she] removed the trash bags and cans out of the prison; [and] #2) MBP Rule Book, Page 18, Rule #41 which prohibits 'store bags (plastic) in cell and to be collected store night.'" (*Id.*, PageID.207.) Defendant Minthorn found Plaintiff guilty and sanctioned him with the maximum sentence of 30 days' LOP without "contact[ing] the mental health department to question whether the mentally ill took precautionary actions." (*Id.*) Plaintiff contends that he was denied a fair hearing. (*Id.*)

Plaintiff also raises a claim against Defendant Washington unrelated to the Start Unit, asserting that MDOC "Policy Directive 01.04.130 is vague and unconstitutional because it []allows someone to order [Plaintiff] what to do or how to behave in a prison setting, without a record of someone asserting a constitutional loss or injury entry." (*Id.*, PageID.201.) According to Plaintiff, Defendant Washington is "making policy or procedure without a record of someone entering any level of government or asserting a constitutional loss." (*Id.*, PageID.203.) The effect "make[s] any and all policies and procedures executed with a material prejudice." (*Id.*)

Based on the foregoing, Plaintiff alleges that Defendants Washington, Huss, Pelky, and Erickson unconstitutionally enacted the Start Unit. (*Id.*, PageID.209.) He avers that the Start Unit is vague and unconstitutional because it has no graduation time or ending to the program, does not award behavior points, has no programming, denies religious services, frustrates legal research,

denies trash cans and bags, subjects inmates to "dog cages" during yard time, and does not utilize the SCC. (*Id.*) Plaintiff alleges further that Defendant Ricklefs violated his First Amendment rights by retaliating against him for engaging in protected speech and that Defendant Mohrman violated his Fourteenth Amendment due process rights by denying him a fair hearing. (*Id.*)

Plaintiff alleges further that Defendant Washington unconstitutionally enacted MDOC Policy Directive 01.04.130. (*Id.*, PageID.210.) Plaintiff avers that Defendant Kessler violated his First, Fourth, and Eighth Amendment rights by: (1) retaliating against him when Plaintiff "took precaution to protect himself from 'power of suggestion of hearing voices'" while in possession of a plastic bag; and (2) interfering and agitating the side effects of Plaintiff's medications by "using the disciplinary process as a choice of weapon." (*Id.*) Plaintiff also contends that Defendant Minthorn violated his Fourteenth Amendment due process rights during the disciplinary proceedings. (*Id.*) Plaintiff also alleges violations of the Americans with Disabilities Act (ADA).

Plaintiff seeks the following injunctive relief: (1) closure of the Start Unit and a finding that it is unconstitutional; (2) a "suitable placement"; (3) a "new parole application procedure mandating amalgam elements to be stated in prison records or lifer's file review"; and (4) an order directing that Defendant Huss can be called as a witness in misconduct proceedings. (*Id.*, PageID.211.) Plaintiff also seeks declaratory relief. (*Id.*) Finally, Plaintiff seeks compensatory damages against Ricklefs, Kessler, Minthorn, and Mohrman, as well as punitive damages against Defendants Ricklefs, Kessler, and Minthorn. (*Id.*, PageID.212.)

## II.  Failure to State a Claim

A complaint may be dismissed for failure to state a claim if it fails "'to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). While a complaint need not contain detailed factual allegations, a plaintiff's allegations must include more

than labels and conclusions. *Twombly*, 550 U.S. at 555; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). The court must determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 679. Although the plausibility standard is not equivalent to a "'probability requirement,' . . . it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 678 (quoting *Twombly*, 550 U.S. at 556). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—that the pleader is entitled to relief." *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)); *see also Hill v. Lappin*, 630 F.3d 468, 470–71 (6th Cir. 2010) (holding that the *Twombly/Iqbal* plausibility standard applies to dismissals of prisoner cases on initial review under 28 U.S.C. §§ 1915A(b)(1) and 1915(e)(2)(B)(i)).

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege the violation of a right secured by the federal Constitution or laws and must show that the deprivation was committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Street v. Corr. Corp. of Am.*, 102 F.3d 810, 814 (6th Cir. 1996). Because § 1983 is a method for vindicating federal rights, not a source of substantive rights itself, the first step in an action under § 1983 is to identify the specific constitutional right allegedly infringed. *Albright v. Oliver*, 510 U.S. 266, 271 (1994).

### A.   Claims Regarding the Implementation of the Start Unit

Plaintiff suggests that Defendants Washington, Huss, Pelky, and Erickson violated the Constitution and the ADA by creating, generating, and implementing DOM 2021-17, which

created the Start Unit. (ECF No. 22, PageID.209.) He avers that the Start Unit is vague and unconstitutional because it has no graduation time or ending to the program, does not award behavior points, has no programming, denies religious services, frustrates legal research, denies trash cans and bags, subjects inmates to "dog cages" during yard time, and does not utilize the SCC. (*Id.*) Thus, Plaintiff appears to suggest that the Start Unit violates numerous constitutional provisions, including the First, Eighth, and Fourteenth Amendments.

When taken individually, Plaintiff has not set forth plausible constitutional claims on any of the bases set forth above. For example, while inmates retain a First Amendment right to freely practice their religion, *see O'Lone v. Shabazz*, 482 U.S. 342, 348 (1987), Plaintiff has not set forth any facts regarding his own religious beliefs and how they have been infringed upon by his placement in the Start Unit. *See Kent v. Johnson*, 821 F.2d 1220, 1224–25 (6th Cir. 1987). Likewise, Plaintiff has not alleged any facts regarding how an inability to regularly access the law library has impeded his access to the courts and ability to pursue a nonfrivolous legal claim. *See Lewis v. Casey*, 518 U.S. 343, 349, 351–53 (1996). Plaintiff's claims regarding yard privileges and the denial of trash bags and cans do not state such extreme circumstances that they rise to the level of Eighth Amendment violations as denials of the "minimal civilized measure of life's necessities." *See Rhodes v. Chapman*, 452 U.S. 337, 347 (1981).

Plaintiff's complaints about the constitutionality of the Start Unit essentially rest upon his belief that the Unit discriminates against those who have been classified as suffering from major mental disorders. The Court, therefore, construes Plaintiff's claim regarding the constitutionality of the Start Unit to be premised on a violation of the Fourteenth Amendment's Equal Protection Clause.

The Equal Protection Clause of the Fourteenth Amendment provides that a state may not "deny to any person within its jurisdiction the equal protection of the laws[,]" which is essentially a direction that all persons similarly situated should be treated alike. U.S. Const. amend. XIV; *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985). When a law adversely impacts a "suspect class" such as one defined by race, alienage, or national origin, or invades a "fundamental right" such as speech or religious freedom, the rigorous "strict scrutiny" standard governs, whereby such laws "will be sustained only if they are suitably tailored to serve a compelling state interest." *City of Cleburne*, 473 U.S. at 440. Where legislation singularly and negatively affects a "quasi-suspect" class such as one defined by gender, the level of scrutiny is "intermediate," and the law is valid if it is "substantially related to a sufficiently important government interest." *Id.* at 440–41. However, a state practice generally will not require strict scrutiny unless it interferes with a fundamental right or discriminates against a suspect class of individuals. *Mass. Bd. of Ret. v. Murgia*, 427 U.S. 307, 312 (1976).

Here, Plaintiff does not implicate a fundamental right, and he does not allege that he is a member of a suspect class or that Defendants discriminated against him because he was member of a suspect or quasi-suspect class. "[P]risoners are not a suspect class," *Hadix v. Johnson*, 230 F.3d 840, 843 (6th Cir. 2000), "nor are classifications of prisoners," *Mader v. Sanders*, 67 F. App'x 869, 871 (6th Cir. 2003), for example, prisoners holding the same security classification, *id*. Rather, Plaintiff contends that the structure of the Start Unit discriminates against those prisoners, like him, who have major mental disorders.

Because neither a fundamental right nor a suspect class is at issue, Plaintiff's claim is reviewed under the rational basis standard. *Club Italia Soccer & Sports Org., Inc. v. Charter Twp. of Shelby,* 470 F.3d 286, 298 (6th Cir. 2006). "Under rational basis scrutiny, government action

amounts to a constitutional violation only if it 'is so unrelated to the achievement of any combination of legitimate purposes that the court can only conclude that the government's actions were irrational.'" *Id.* (quoting *Warren v. City of Athens*, 411 F.3d 697, 710 (6th Cir. 2005)). To prove his equal protection claim, Plaintiff must demonstrate "intentional and arbitrary discrimination" by the state; that is, he must demonstrate that he "has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000).

The threshold element of an equal protection claim is disparate treatment. *Scarbrough v. Morgan Cnty. Bd. of Educ.*, 470 F.3d 250, 260 (6th Cir. 2006); *Ctr. for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 379 (6th Cir. 2011) ("To state an equal protection claim, a plaintiff must adequately plead that the government treated the plaintiff 'disparately as compared to similarly situated persons and that such disparate treatment either burdens a fundamental right, targets a suspect class, or has no rational basis.'") (quoting *Club Italia Soccer & Sports Org., Inc. v. Charter Twp. Of Shelby*, 470 F.3d 286, 298 (6th Cir. 2006)). "'Similarly situated' is a term of art—a comparator . . . must be similar in 'all relevant respects.'" *Paterek v. Vill. of Armada*, 801 F.3d 630, 650 (6th Cir. 2015) (quoting *United States v. Green*, 654 F.3d 637, 651 (6th Cir. 2011)); *see also Nordlinger*, 505 U.S. at 10; *Tree of Life Christian Sch. v. City of Upper Arlington*, 905 F.3d 357, 368 (6th Cir. 2018) ("A plaintiff bringing an equal protection claim must be 'similarly situated' to a comparator in 'all relevant respects.'").

As noted above, Plaintiff contends that inmates in the Start Unit are not allowed to attend religious services. (ECF No. 22, PageID.197.) Moreover, he avers that yard privileges are often cancelled for the "mentally ill" even when Plaintiff can see "other prisoners in general population on the yard." (*Id.*, PageID.197–198.) Plaintiff also contends that the mentally ill are often denied

showers, the law library, the porter, cleaning supplies, and other needs. (*Id.*) Given these allegations, the Court concludes that Plaintiff has set forth a plausible Fourteenth Amendment equal protection claim regarding the constitutionality of the Start Unit against Defendants Washington, Huss, Pelky, and Erickson.

Plaintiff also suggests that these Defendants' implementation of the Start Unit violates the ADA. Title II of the ADA provides, in pertinent part, that no qualified individual with a disability shall, because of that disability, "be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." *Mingus v. Butler*, 591 F.3d 474, 481–82 (6th Cir. 2010) (citing 42 U.S.C. § 12132). Here, Plaintiff avers that the mentally ill inmates, including himself, in the Start Unit have not been provided access to several services and programs because of their disability. The Court, therefore, concludes that Plaintiff has also set forth a plausible ADA claim against Defendants Washington, Huss, Pelky, and Erickson.

### B. First Amendment Retaliation Claims

Plaintiff alleges that Defendant Ricklefs retaliated against him in violation of the First Amendment by charging him with threatening behavior when Plaintiff was having a conversation with other inmates about his belief that he was illegally incarcerated because there was "no record of show cause." (ECF No. 22, PageID.199.) Plaintiff also alleges that Defendant Kessler retaliated against him in violation of the First Amendment when he issued a misconduct after Plaintiff "took precaution to protect himself from suffocation by 'power of suggestion of hearing voices'" while in possession of a plastic bag. (*Id.*, PageID.210.)

Retaliation based upon a prisoner's exercise of his or her constitutional rights violates the Constitution. *See Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc). In order to set forth a First Amendment retaliation claim, a plaintiff must establish three elements: (1) he was engaged in protected conduct; (2) an adverse action was taken against him that would deter a

person of ordinary firmness from engaging in that conduct; and (3) the adverse action was motivated, at least in part, by the protected conduct. *Id.* Moreover, a plaintiff must be able to prove that the exercise of the protected right was a substantial or motivating factor in the defendant's alleged retaliatory conduct. *See Smith v. Campbell*, 250 F.3d 1032, 1037 (6th Cir. 2001) (citing *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)).

### 1. Protected Activity

With respect to Plaintiff's retaliation claim against Defendant Kessler, while Plaintiff believes that he was protecting himself from self-harm by throwing trash and plastic bags out of his cell, doing so is not protected conduct because such behavior falls under destruction or misuse of property, a Class II misconduct. *See* MDOC Policy Directive 03.03.105, Attach. B (eff. July 1, 2018); *see also Lockett v. Suardini*, 526 F.3d 866, 874 (6th Cir. 2008); *Caffey v. Maue*, 679 F. App'x 487 (7th Cir. 2017) (holding that an inmate's name-calling of guards (calling them unprofessional) was a challenge to the guards' authority that was not protected by the First Amendment); *Felton v. Huibregtse*, 525 F. App'x 484, 487 (7th Cir. 2013) (holding that the use of disrespectful language was not protected conduct) (citing cases); *Freeman v. Tex. Dep't of Crim. Justice*, 369 F.3d 854, 858, 864 (5th Cir. 2004) (concluding that an inmate who accused a chaplain of theological errors during a religious service had engaged in an unprotected challenge to institutional authority). Moreover, the Start Unit rules provide that trash "will not be thrown onto the gallery or flushed down the toilet." (ECF No. 9-10, PageID.108.) Because Plaintiff did not engage in protected activity when he threw trash and plastic bags out of his cell, he cannot maintain his First Amendment retaliation claim against Defendant Kessler. That claim will, therefore, be dismissed.

With respect to his claims against Defendant Ricklefs, an inmate has a right to file "non-frivolous" grievances against prison officials on his own behalf, whether written or oral. *Maben v.*

13

*Thelen*, 887 F.3d 252, 265 (6th Cir. 2018); *Mack v. Warden Loretto FCI*, 839 F.3d 286, 298–99 (3d Cir. 2016) (holding that "the [prisoner's] oral grievance to [the prison officer] regarding the anti-Muslim harassment he endured at work constitutes protected activity under the First Amendment."); *Pearson v. Welborn*, 471 F.3d 732, 741 (7th Cir. 2006) (concluding that "legitimate complaints [do not] lose their protected status simply because they are spoken."); *see also Pasley v. Conerly*, 345 F. App'x 981, 984–85 (6th Cir. 2009) (finding that a prisoner engaged in protected conduct by *threatening* to file a grievance). "Nothing in the First Amendment itself suggests that the right to petition for redress of grievances only attaches when the petitioning takes a specific form." *Holzemer v. City of Memphis*, 621 F.3d 512, 521 (6th Cir. 2010) (finding that a conversation constituted protected petitioning activity) (quoting *Pearson*, 471 F.3d at 741).

Here, Plaintiff avers that he was talking to other inmates regarding the legality of his incarceration when Defendant Ricklefs overheard and charged him with threatening behavior. Taking Plaintiff's allegations as true, as the Court must for screening purposes, Plaintiff's complaint sufficiently raises an inference that he was making an oral complaint about the legality of his incarceration. Plaintiff, therefore, has alleged sufficient facts to indicate that he was engaged in protected conduct for purposes of his First Amendment claim against Defendant Ricklefs.

### 2.    Adverse Action

A specific threat of harm may satisfy the adverse-action requirement if it would deter a person of ordinary firmness from exercising his or her First Amendment rights, *see, e.g.*, *Thaddeus-X*, 175 F.3d at 396, 398 (threat of physical harm); *Smith v. Yarrow*, 78 F. App'x 529, 542 (6th Cir. 2003) (threat to change drug test results). However, certain threats or deprivations are so *de minimis* that they do not rise to the level of being constitutional violations. *Thaddeus-X*, 175 F.3d at 398; *Smith*, 78 F. App'x at 542. Receipt of a misconduct is adverse action sufficient to support a retaliation claim. *See Thomas v. Eby*, 481 F.3d 434, 441 (6th Cir. 2007). Moreover, as a

result of a Class I misconduct (such as for threatening behavior), a prisoner may be subjected to: (1) detention "not to exceed 10 days for each violation or 20 days for all violations arising from a single incident"; (2) toplock for up to 30 days; (3) loss of privileges "not to exceed 30 days for each violation or 60 days for all violations arising from a single incident"; and (4) "[r]estitution and/or disgorgement of funds/ill-gotten gains." *See* MDOC Policy Directive 03.03.105, Attach. D (eff. Apr. 18, 2022). Even seven days' loss of privileges—which includes loss of the rights to use the exercise facilities, to attend group meetings, to use the telephone, to receive visitors, to access the general library, and to access the activity room—amounts to adverse action. *See Maben*, 887 F.3d at 266–67 (quoting *Hill v. Lappin*, 630 F.3d 468, 474 (6th Cir. 2010) (holding that "actions that result in more restrictions and fewer privileges for prisoners are considered adverse")). The *Maben* court noted the contrary holding in *Ingram v. Jewell*, 94 F. App'x 271, 273 (6th Cir. 2004) (citing *Thaddeus-X*, 175 F.3d at 396–97) (14 days' loss of privileges does not constitute an adverse action), and, because *Maben* was a published opinion, it effectively overruled *Ingram*. Plaintiff's Class I misconduct conviction for threatening behavior, therefore, was sufficiently adverse for purposes of the second prong of a retaliation claim.

### 3.  Retaliatory Motive

Finally, the conversation that Plaintiff characterizes as protected conduct is the very same conversation that Defendant Ricklefs reported to be threatening behavior. Thus, it is beyond dispute that the adverse action—the threat of sanctions for threatening behavior—was motivated by the protected conduct. Plaintiff, therefore, has sufficiently set forth a plausible First Amendment claim against Defendant Ricklefs.

### C.  Fourth Amendment Claim

Plaintiff vaguely contends that Defendant Kessler's actions violated his Fourth Amendment rights. (ECF No. 22, PageID.210.)

In *Hudson v. Palmer*, 468 U.S. 517 (1984), the Supreme Court considered and rejected a Fourth Amendment claim based upon a prison official searching a prisoner's cell and destroying some of his legal papers in the process. *Id.* at 519, 535. The prisoner claimed that the prison official's conduct constituted an unreasonable search and seizure of his property, in violation of the Fourth Amendment. *Id.* at 530. The Court disagreed.

First, the Court recognized that while prisoners are not beyond the reach of the Constitution, "curtailment of certain rights is necessary, as a practical matter, to accommodate a 'myriad of institutional needs and objectives' of prison facilities, . . . chief among which is internal security." *Id.* at 523–24 (internal citation omitted). The Court then determined that the official's search of the prisoner's cell did not violate the Fourth Amendment because "society is not prepared to recognize as legitimate any subjective expectation of privacy that a prisoner might have in his prison cell." *Id.* at 526. According to the Court, "[a] right of privacy in traditional Fourth Amendment terms is fundamentally incompatible with the close and continual surveillance of inmates and their cells required to ensure institutional security and internal order." *Id.* at 527–28. For similar reasons, the Court held that the Fourth Amendment "does not protect against seizures in a prison cell." *Id.* at 528 n.8.

Like in *Hudson*, Plaintiff simply has no expectation of or right of privacy in his prison cell. The Court, therefore, will dismiss Plaintiff's Fourth Amendment claim against Defendant Kessler.

### D.     Eighth Amendment Claim

Plaintiff also contends that Defendant Kessler violated his Eighth Amendment rights by demonstrating deliberate indifference to his mental conditions. (ECF No. 22, PageID.210.) Specifically, Plaintiff suggests that Defendant Kessler violated his Eighth Amendment rights by issuing the misconduct, which exacerbated the side effects of Plaintiff's medications, causing him to experience higher anxiety, chest pains, headaches, and psychotic depression. (*Id.*) Plaintiff

suggests that Defendant Kessler used the "disciplinary process as a choice of weapon." (*Id.*) He avers further that Defendant Kessler intended to interfere with his medical treatment. (*Id.*, PageID.205.)

The Eighth Amendment prohibits the infliction of cruel and unusual punishment against those convicted of crimes. U.S. Const. amend. VIII. The Eighth Amendment obligates prison authorities to provide medical care to incarcerated individuals, as a failure to provide such care would be inconsistent with contemporary standards of decency. *Estelle v. Gamble*, 429 U.S. 97, 103–04 (1976). The Eighth Amendment is violated when a prison official is deliberately indifferent to the serious medical needs of a prisoner. *Id.* at 104–05; *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001).

Deliberate indifference may be manifested by a doctor's failure to respond to the medical needs of a prisoner, or by "prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed. Regardless of how evidenced, deliberate indifference to a prisoner's serious illness or injury states a cause of action under § 1983." *Estelle*, 429 U.S. at 104–05.

A claim for the deprivation of adequate medical care has an objective and a subjective component. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). To satisfy the objective component, the plaintiff must allege that the medical need at issue is sufficiently serious. *Id.* In other words, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm. *Id.* The objective component of the adequate medical care test is satisfied "[w]here the seriousness of a prisoner's need[] for medical care is obvious even to a lay person." *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 899 (6th Cir. 2004); *see also Phillips v. Roane Cnty.*, 534 F.3d 531, 539–40 (6th Cir. 2008). Obviousness, however, is not strictly limited to what is detectable to

the eye. Even if the layman cannot see the medical need, a condition may be obviously medically serious where a layman, if informed of the true medical situation, would deem the need for medical attention clear. *See, e.g.*, *Rouster v. Saginaw Cnty.*, 749 F.3d 437, 446–51 (6th Cir. 2014) (holding that a prisoner who died from a perforated duodenum exhibited an "objectively serious need for medical treatment," even though his symptoms appeared to the medical staff at the time to be consistent with alcohol withdrawal); *Johnson v. Karnes*, 398 F.3d 868, 874 (6th Cir. 2005) (holding that prisoner's severed tendon was a "quite obvious" medical need, since "any lay person would realize to be serious," even though the condition was not visually obvious). If the plaintiff's claim, however, is based on "the prison's failure to treat a condition adequately, or where the prisoner's affliction is seemingly minor or non-obvious," *Blackmore*, 390 F.3d at 898, the plaintiff must "place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment," *Napier v. Madison Cnty.*, 238 F.3d 739, 742 (6th Cir. 2001) (internal quotation marks omitted).

The subjective component requires an inmate to show that prison officials have "a sufficiently culpable state of mind" in denying medical care. *Brown v. Bargery*, 207 F.3d 863, 867 (6th Cir. 2000). Deliberate indifference "entails something more than mere negligence," but can be "satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Farmer*, 511 U.S. at 835. "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837. To prove a defendant's subjective knowledge, "[a] plaintiff may rely on circumstantial evidence . . . : A jury is entitled to 'conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.'" *Rhinehart v. Scutt*, 894 F.3d 721, 738 (6th Cir. 2018) (quoting *Farmer*, 511 U.S. at 842)).

Here, Plaintiff has failed to allege facts suggesting that Defendant Kessler was aware of any risk to Plaintiff's health or safety and disregarded such risk by issuing the misconduct. While Defendant Kessler may have been aware that Plaintiff suffers from mental illness, nothing in the complaint leads to a conclusion that Defendant Kessler intentionally interfered with Plaintiff's treatment by issuing the misconduct. *See Estelle*, 429 U.S. at 104–05. Plaintiff has failed to allege facts suggesting that Defendant Kessler knew that Plaintiff would suffer increased side effects upon receiving the misconduct. The Court, therefore, will dismiss Plaintiff's Eighth Amendment claim against Defendant Kessler.

### E.    Fourteenth Amendment Due Process Claims

Plaintiff contends that Defendants Mohrman and Minthorn violated his Fourteenth Amendment due process rights during his misconduct proceedings by denying him the right to call witnesses and denying relevant documents. (ECF No. 22, PageID.209–210.)

"The Fourteenth Amendment protects an individual from deprivation of life, liberty or property, without due process of law." *Bazzetta v. McGinnis*, 430 F.3d 795, 801 (6th Cir. 2005). To establish a Fourteenth Amendment procedural due process violation, a plaintiff must show that one of these interests is at stake. *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005). Analysis of a procedural due process claim involves two steps: "[T]he first asks whether there exists a liberty or property interest which has been interfered with by the State; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient . . . ." *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989) (citations omitted).

The United States Supreme Court long has held that the Due Process Clause does not protect every change in the conditions of confinement having an impact on a prisoner. *See Meachum v. Fano*, 427 U.S. 215, 225 (1976). In *Sandin v. Conner*, the Supreme Court set forth the standard for determining when a state-created right creates a federally cognizable liberty

19

interest protected by the Due Process Clause. 515 U.S. 472, 484 (1995). According to that Court, a prisoner is entitled to the protections of due process only when the sanction "will inevitably affect the duration of his sentence" or when a deprivation imposes an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.* at 486–87; *see also Jones v. Baker*, 155 F.3d 810, 812 (6th Cir. 1998); *Rimmer-Bey v. Brown*, 62 F.3d 789, 790–91 (6th Cir. 1995).

A prisoner's ability to challenge a prison misconduct conviction depends on whether the conviction implicated any liberty interest. In the seminal case in this area, *Wolff v. McDonnell*, 418 U.S. 539 (1974), the Court prescribed certain minimal procedural safeguards that prison officials must follow before depriving a prisoner of good-time credits on account of alleged misbehavior. The *Wolff* Court did not create a free-floating right to process that attaches to all prison disciplinary proceedings; rather the right to process arises only when the prisoner faces a loss of liberty, in the form of a longer prison sentence caused by forfeiture of good-time credits:

> It is true that the Constitution itself does not guarantee good-time credit for satisfactory behavior while in prison. But here the State itself has not only provided a statutory right to good time but also specifies that it is to be forfeited only for serious misbehavior. Nebraska may have the authority to create, or not, a right to a shortened prison sentence through the accumulation of credits for good behavior, and it is true that the Due Process Clause does not require a hearing "in every conceivable case of government impairment of private interest." But the State having created the right to good time and itself recognizing that its deprivation is a sanction authorized for major misconduct, the prisoner's interest has real substance and is sufficiently embraced within Fourteenth Amendment "liberty" to entitle him to those minimum procedures appropriate under the circumstances and required by the Due Process Clause to insure that the state-created right is not arbitrarily abrogated.

*Wolff*, 418 U.S. at 557 (citations omitted).

Under MDOC Policy Directive 03.03.105, a Class I misconduct is a "major" misconduct, and Class II and III misconducts are "minor" misconducts. *See* MDOC Policy Directive 03.03.105

20

¶ B (eff. July 1, 2018). The policy further provides that prisoners are deprived of good time or disciplinary credits only when they are found guilty of a Class I misconduct. *Id.*, ¶ AAAA. A deprivation of earned good time is the type of sanction that could possibly affect the duration of a sentence.

Plaintiff has not provided copies of the misconduct documents relating to his claims against Defendant Mohrman, but he did attach copies of the misconduct documents relating to his claims against Defendant Minthorn to his first amended complaint. Those documents indicate that on January 11, 2022, Defendant Kessler wrote Plaintiff a misconduct for destruction or misuse of property. (ECF No. 9-10, PageID.107–110.) A misconduct charge for destruction or misuse of property is a Class II misconduct under the MDOC disciplinary regime. *See* MDOC Policy Directive 03.03.105, Attach. B. Plaintiff could not have been denied good time or disciplinary credits as a result of a Class II misconduct. *See id.* ¶ AAAA. The Sixth Circuit routinely has held that misconduct convictions that do not result in the loss of good time are not atypical and significant deprivations and therefore do not implicate due process. *See, e.g.*, *Ingram v. Jewell*, 94 F. App'x 271, 273 (6th Cir. 2004), *overruled on other grounds by Maben v. Thelen*, 887 F.3d 252 (6th Cir. 2018); *Carter v. Tucker*, 69 F. App'x 678, 680 (6th Cir. 2003); *Green v. Waldren*, No. 99-1561, 2000 WL 876765, at *2 (6th Cir. June 23, 2000); *Staffney v. Allen*, No. 98-1880, 1999 WL 617967, at *2 (6th Cir. Aug. 12, 1999).

With respect to his claim concerning Defendant Mohrman, Plaintiff contends that he received a misconduct for threatening behavior from Defendant Ricklefs and that Defendant Mohrman found him guilty of the misconduct after a hearing held on April 14, 2021. (ECF No. 22, PageID.199–200.) Threatening behavior is a Class I misconduct. *See* MDOC Policy Directive 03.03.105, Attach. A. Plaintiff, however, cannot allege that this major misconduct

conviction affected the duration of his sentence. The Sixth Circuit has examined Michigan statutory law, as it relates to the creation and forfeiture of disciplinary credits[1] for prisoners convicted for crimes occurring after April 1, 1987. In *Thomas v. Eby*, 481 F.3d 434 (6th Cir. 2007), the court determined that loss of disciplinary credits does not necessarily affect the duration of a prisoner's sentence. Rather, it merely affects parole eligibility, which remains discretionary with the parole board. 481 F.3d at 440; *see also Nali v. Ekman*, 355 F. App'x 909, 912 (6th Cir. 2009). In the absence of a demonstrated liberty interest, Plaintiff has no due process claim based on the loss of disciplinary credits. *See Bell v. Anderson*, 301 F. App'x 459, 461–62 (6th Cir. 2008).

Plaintiff is currently serving a term of life, imposed on August 30, 1990, for armed robbery and second-degree murder. *See Cromer v. Huss*, No. 2:21-cv-205, 2021 WL 4810292, at *1 (W.D. Mich. Oct. 15, 2021). After being convicted of those offenses, Plaintiff pleaded guilty and was convicted of attempting to receive stolen property. *Id.* at *2. "This offense occurred on July 14, 1986. On September 25, 1990, the [trial] court sentenced [Plaintiff] to a term of 1 year to 2 years, 6 months to be served consecutively to [his] existing sentences." *Id.*

Plaintiff, therefore, is presently serving sentences imposed for crimes occurring after April 1, 1987. Plaintiff may be earning disciplinary credits but is not earning "good time." Plaintiff "is in the unusual situation where his subsequent and consecutive indeterminate sentence is for a crime committed before April 1, 1987." *Id.* at *7. When Plaintiff begins to serve that sentence, he will be eligible to earn "good time." *See* Mich. Comp. Laws § 800.33. Until then, however, disciplinary proceedings will not impact the duration of his sentence. *See Sandin*, 515 U.S. at 486–87.

---

[1] For crimes committed after April 1, 1987, Michigan prisoners earn "disciplinary credits" under a statute that abolished the former good-time system. *See* Mich. Comp. Laws § 800.33(5).

Plaintiff also cannot allege that he suffered an "atypical and significant" deprivation. *Sandin*, 515 U.S. at 486–87. Plaintiff alleges that he received 21 days' and 30 days' LOP, respectively. (ECF No. 22, PageID.200, 207; *see also* ECF No. 9-10, PageID.107–110.) Pursuant to MDOC Policy Directive 03.03.105, the "loss of privileges" sanction involves the loss of various privileges, such as access to the day room, exercise facilities, group meetings, "[o]ut of cell hobbycraft activities," the kitchen area, the general library (not including the law library), movies, music practice, and other "[l]eisure time activities." MDOC Policy Directive 03.03.105, Attach. E (eff. July 1, 2018). Federal courts consistently have found that prisoners have no constitutionally protected liberty interest in prison vocational, rehabilitation, and educational programs or activities under the Fourteenth Amendment. *See, e.g.*, *Moody v. Daggett*, 429 U.S. 78, 88 n.9 (1976) (holding that the Due Process Clause was not implicated by prisoner classification and eligibility for rehabilitative programs, even where inmate suffers "grievous loss"); *Argue v. Hofmeyer*, 80 F. App'x 427, 429 (6th Cir. 2003) (finding that prisoners have no constitutional right to rehabilitation, education or jobs); *Canterino v. Wilson*, 869 F.2d 948, 952–54 (6th Cir. 1989) (concluding that prisoners have no constitutional right to rehabilitation); *Antonelli v. Sheahan*, 81 F.3d 1422, 1431 (7th Cir. 1996) (finding that participation in a rehabilitative program is a privilege that the Due Process Clause does not guarantee); *Rizzo v. Dawson*, 778 F.2d 527, 531 (9th Cir. 1985) (concluding that prisoners have no constitutional right to rehabilitative services). Plaintiff, therefore, cannot maintain his Fourteenth Amendment due process claims against Defendants Mohrman and Minthorn, and such claims will be dismissed.

## F.     ADA Claims Against Defendant Kessler

Plaintiff also vaguely suggests that Defendant Kessler's actions violated his rights under the ADA. (ECF No. 22, PageID.210.) As noted above, Title II of the ADA provides, in pertinent part, that no qualified individual with a disability shall, because of that disability, "be denied the

benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." *Mingus*, 591 F.3d at 481–82 (citing 42 U.S.C. § 12132). Plaintiff's second amended complaint is devoid of facts from which the Court could infer violations of the ADA by Defendant Kessler. Accordingly, Plaintiff's ADA claims against Defendant Kessler will be dismissed.

### G.      Claim Regarding Constitutionality of MDOC Policy Directive 01.04.130

As noted above, Plaintiff also raises a claim against Defendant Washington unrelated to the Start Unit, asserting that MDOC "Policy Directive 01.04.130 is vague and unconstitutional because it []allows someone to order [Plaintiff] what to do or how to behave in a prison setting, without a record of someone asserting a constitutional loss or injury entry." (ECF No. 22, PageID.201.) According to Plaintiff, Defendant Washington is "making policy or procedure without a record of someone entering any level of government or asserting a constitutional loss." (*Id.*, PageID.203.) The effect "make[s] any and all policies and procedures executed with a material prejudice." (*Id.*) Plaintiff's claim is "nothing more than unintelligible legalistic gobbledygook." *Cromer v. Snyder*, No. 1:17-cv-94, 2017 WL 1130032, at *1 (W.D. Mich. Mar. 27, 2017). Plaintiff fails to indicate in any meaningful way why MDOC Policy Directive 01.04.130 is unconstitutional. Conclusory allegations of unconstitutional conduct without specific factual allegations fail to state a claim under § 1983. *See Iqbal*, 556 U.S. at 678–79; *Twombly*, 550 U.S. at 555. Accordingly, Plaintiff's claim against Defendant Washington regarding the constitutionality of MDOC Policy Directive 01.04.130 will be dismissed.

### Conclusion

Having conducted the review required by the Prison Litigation Reform Act, the Court determines that Defendants Kessler, Mohrman, and Minthorn will be dismissed for failure to state a claim, under 28 U.S.C. § 1915A(b), and 42 U.S.C. § 1997e(c). The Court will also dismiss, for

failure to state a claim, Plaintiff's claim against Defendant Washington regarding the constitutionality of MDOC Policy Directive 01.04.130. The following claims remain in the case: (1) Plaintiff's Fourteenth Amendment equal protection and ADA challenges to the Start Unit; and (2) Plaintiff's First Amendment retaliation claim against Defendant Ricklefs.

An order consistent with this opinion will be entered.

Dated:   April 29, 2022                              /s/ Hala Y. Jarbou
                                                    HALA Y. JARBOU
                                                    UNITED STATES DISTRICT JUDGE